No. 13-1721(L)

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

———————

FIRST PROFESSIONALS INSURANCE COMPANY
*Plaintiff*

**v.**

KYRSTEN E. SUTTON, M.D.
*Third Party Plaintiff—Appellee*

**v.**

THE MEDICAL PROTECTIVE COMPANY
*Third Party Defendant—Appellant*

———————

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR DISTRICT OF SOUTH CAROLINA (CHARLESTON DIVISION)

———————

CORRECTED BRIEF OF APPELLANT
THE MEDICAL PROTECTIVE COMPANY

———————

John T. Lay                         John R. Gerstein
Laura W. Jordan                     Gabriela Richeimer
Janice Holmes                       TROUTMAN SANDERS LLP
GALLIVAN WHITE & BOYD P.A.          401 9th Street, NW
P.O. Box 7368                       Washington, DC 20004
Columbia, SC 29202                  (202) 274-2950
(803) 779-1833
                                    *Counsel for The Medical Protective
                                    Company*

ORAL ARGUMENT REQUESTED

## CORPORATE DISCLOSURE STATEMENT

Pursuant to FRAP 26.1 and Local Rule 26.1, appellant The Medical Protective Company states:

1.      Is party/amicus a publicly held corporation or other publicly held entity?

No.

2.      Does party/amicus have any parent corporations? If yes, identify all parent corporations, including grandparent and great-grandparent corporations.

MedPro is wholly owned by Medical Protective Corporation, which is a holding company owned by Columbia Insurance Company, which is owned by BH Columbia, Inc., which is owned by OBH, Inc., which is owned by Berkshire Hathaway Inc.

3.      Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?  If yes, identify all such owners.

Berkshire Hathaway Inc., identified in response to Question 2, is a publicly traded company.

4.      Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation (Local Rule 26.1(b))? If yes, identify entity and nature of interest.

No.

5.      Is party a trade association? (amici curiae do not complete this question) If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member.

No.

6.      Does this case arise out of a bankruptcy proceeding? If yes, identify any trustee and the members of any creditors' committee.

No.

# TABLE OF CONTENTS

**Page**

CORPORATE DISCLOSURE STATEMENT ..........................................i

TABLE OF AUTHORITIES ....................................................vi

JURISDICTIONAL STATEMENT ............................................1

STATEMENT OF ISSUES ..................................................1

INTRODUCTION ..............................................................2

STATEMENT OF THE CASE ...............................................3

STATEMENT OF FACTS ....................................................7

    A.    Dr. Sutton's Medical Malpractice Insurance Coverage With MedPro (2003-2009)...........................................7

    B.    MedPro's Easy, One-Step Intake Procedure For Claims And Potential Claims Reported Under The Policy..................8

    C.    Mrs. Moore's Labor And Delivery in 2004 Was Not Troubling To Dr. Sutton and Did Not Result in a Claim Against Her During Any MedPro Policy Period ....................10

    D.    Dr. Sutton Was Worried About Her Increasing Insurance Premiums When She Settled An Earlier, Unrelated Claim In Early 2008.....................................................11

    E.    Dr. Sutton Received An "Unusual Letter" From A Hospital Risk Analyst In May 2008 .........................12

    F.    Dr. Sutton Switched To Less Expensive Coverage from FPIC in 2009 And Received the Moore Claim in 2011..........15

    G.    FPIC's Coverage Investigation  Caused Her To Testify That She Contacted MedPro In 2008 Regarding The Unusual 2008 St. Francis Letter ...............................15

SUMMARY OF ARGUMENT ..............................................17

ARGUMENT ..................................................................20

I.    THE DISTRICT COURT ERRED AS A MATTER OF LAW IN ITS INTERPRETATION OF THE MEDPRO POLICY ...................20

    A.    Standard Of Review .......................................20

# **TABLE OF CONTENTS**

**Page**

B.    The District Court's Construction Of The MedPro Policy Contradicts Controlling South Carolina Principles Of Contract Interpretation And Should Be Reversed ............................21

    1.    Under South Carolina Law, The Insured Has The Burden To Prove Strict Compliance With Express Conditions Precedent To Coverage ............................21

        a.    The Court Should Enforce The Plain And Unambiguous Language Of A Parties' Contract...........21

        b.    Under South Carolina Law, Conditions Precedent Should Be Enforced Strictly, As Written .....................22

    2.    Dr. Sutton As A Matter Of Law Has Not Established That She Reported a "Potential Claim" Under The Terms of the MedPro Insuring Agreement ..........................24

    3.    The District Court's Authority Is Inconsistent With South Carolina Law and Distinguishable............................31

II.    THE DISTRICT COURT IMPERMISSIBLY SHIFTED THE BURDEN OF PROOF TO MEDPRO TO DISPROVE DR. SUTTON'S SELF-SERVING ASSERTION OF CALLING MEDPRO AFTER RECEIVING THE 2008 ST. FRANCIS LETTER.......36

    A.    Standard Of Review ........................................................36

    B.    Dr. Sutton's Uncorroborated, Self-Serving Testimony Is Insufficient As a Matter of Law to Sustain Her Burden to Prove Coverage Under the MedPro Policy .................................37

III.    THE DISTRICT COURT'S FINDING THAT SUTTON REPORTED A POTENTIAL CLAIM TO MEDPRO IS CLEARLY ERRONEOUS .....41

    A.    Standard of Review .........................................................41

    B.    The District Court Erroneously Accepted Dr. Sutton's Self-Serving Testimony That She Reported The 2008 St. Francis Letter To MedPro Despite The Lack of Credible Supporting Evidence And Overwhelming Evidence To The Contrary ...............42

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

IV.    THE DISTRICT COURT DENIED MEDPRO A FAIR TRIAL BY
COMMANDEERING THE QUESTIONING OF PARTY
WITNESSES TO CREATE A RECORD OSTENSIBLY
SUPPORTING A FINDING THAT DR. SUTTON REPORTED A
POTENTIAL CLAIM TO MEDPRO ...........................................48

    A.    Standard of Review ......................................................49

    B.    The District Court's Extensive Examination Of Mr. Costy and
Rehabilitative Questioning of Dr. Sutton Demonstrate Bias And
Pre-Judgment That Dr. Sutton Reported A Potential Claim To
MedPro Despite Dr. Sutton's Lack Of Belief That The 2008 St.
Francis Letter Represented A Potential Claim ..................................50

CONCLUSION .........................................................................58

REQUEST FOR ORAL ARGUMENT ...............................................58

CERTIFICATE OF COMPLIANCE WITH RULE 28.1(E) OR 32(A) ...............60

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Am. Cas. Co. of Reading, Pa. v. Continisio,*
17 F.3d 62 (3d Cir. 1994) ...............................................................26, 28

*Am. Cas. Co. v. FDIC,*
821 F. Supp. 655 (W.D. Okla. 1993),
*aff'd,* 33 F.3d 62 (10th Cir. 1994)...........................................28, 29, 38

*Aqua Bar & Lounge, Inc. v. United States,*
438 F. Supp. 655 (E.D. Pa. 1977)................................................38

*B.L.G. Enters., Inc. v. First Fin. Ins. Co.,*
514 S.E.2d 327 (S.C. 1999) .........................................................22

*Blue v. U.S. Dep't of Army,*
914 F.2d 525 (4th Cir. 1990) .......................................................37

*Bowman v. Std. Fire Ins. Co.,*
397 F. App'x 886 (4th Cir. 2010) ...............................................22

*Brewer v. Stokes Kia, Isuzu, Subaru, Inc.,*
613 S.E.2d 802 (S.C. Ct. App. 2005) .........................................23

*Bruce v. U.S. Fid.& Guar. Co.,*
277 F. Supp. 439 (D.S.C. 1967) .................................................23

*Bryan Bros. Inc. v. Cont'l Cas. Co.,*
419 F. App'x 422 (4th Cir. 2011) ..........................................23, 26

*Crandell v. United States,*
703 F.2d 74 (4th Cir. 1983) ..........................................49, 50, 55, 56

*Doctors Co. v. Health Mgmt. Assocs. Inc.,*
943 So. 2d 807 (Fla. Dist. Ct. App. 2006) .................................26

*FDIC v. Barham,*
995 F.2d 600 (5th Cir. 1993) .......................................................27

# TABLE OF AUTHORITIES

**Page(s)**

*FDIC v. Cont'l Cas. Co.*,
   796 F. Supp. 1344 (D. Or. 1991) ...................................................28

*FDIC v. Mijalis*,
   15 F.3d 1314 (5th Cir. 1994) ......................................................28

*Federal Sav. and Loan Ins. Corp. v. Burdette*,
   718 F. Supp. 649 (E.D. Tenn. 1989)...........................................34

*Feldman v. Charlotte-Mecklenburg Bd. Of Educ.*,
   No. 3:11-cv-34-RJC-DSC,  2012 U.S. Dist. LEXIS 117636 (W.D.N.C.
   Aug. 21, 2012) ...........................................................................37

*First Am. Title Ins. Co. v. Cont'l Cas. Co.*,
   709 F.3d 1170 (5th Cir. 2013) ....................................................26

*Fort Sumter Tours, Inc. v. Babbitt*,
   66 F.3d 1324 (4th Cir. 1995) ......................................................20

*Gray v. Spillman*,
   No. 91-7199, 993 F.2d 1537, 1993 SL 165039 (4th Cir. May 17, 1993)...........38

*GS2 Eng'g & Envtl. Consultants, Inc. v. Zurich Am. Ins. Co.*,
   No. 3:12-cv-02934-CMC, 2013 U.S. Dist. LEXIS 95137 (D.S.C. July 9,
   2013) ........................................................................................25

*Hansen v. United Servs. Auto. Ass'n*,
   565 S.E.2d 114 (S.C. Ct. App. 2002) .........................................22

*Harbor Ins. Co. v. Cont'l Bank Corp.*,
   922 F.2d 357 (7th Cir. 1990) ......................................................27

*In re Pizzuto*,
   No. 99-5073, 384 B.R. 105 (Bankr. D.N.J. 2008)......................39

*Jackson v. United States*,
   329 F.2d 893 (D.C. Cir. 1964)....................................................56

*Jiminez v. Mary Washington Coll.*,
   57 F.3d 369 (4th Cir. 1995) ........................................................42

## <u>TABLE OF AUTHORITIES</u>

<u>Page(s)</u>

*LaForge v. Am. Cas. Co. of Reading, Pa.*,
   37 F.3d 580 (10th Cir. 1994) ...............................................................27

*Landry v. Intermed Ins.Co.*,
   292 S.W.3d 352 (Mo. Ct. App. 2009) ...............................................34

*M&M Corp. of S.C. v. Auto-Owners Ins. Co.*,
   701 S.E.2d 33 (S.C. 2010) ...................................................................21

*McCullough v. Fid.& Deposit Co.*,
   2 F.3d 110 (5th Cir. 1993) ....................................................................27

*McGill v. Moore*,
   672 S.E.2d 571 (S.C. 2009) ................................................................24

*Myers v. Dolgencorp, Inc.*,
   No. 04-4137, 2006 U.S. Dist. LEXIS 6559 (D. Kan. Feb. 15, 2006) .........39, 40

*N. Am. Specialty Ins. Co. v. Correctional Med. Servs., Inc.*,
   527 F.3d 1033 (10th Cir. 2008) ..........................................................36

*Nat'l Elec. Mfrs. Ass'n v. Gulf Underwriters Ins. Co.*,
   162 F.3d 821 (4th Cir. 1998) ...............................................................22

*Nehi Bottling Co., Inc. v. All-American Bottling Corp.*,
   8 F.3d 157 (4th Cir. 1993) ....................................................................20

*Owatonna Clinic-Mayo Health System v. Medical Protective Co. of Ft. Wayne, Ind.*,
   639 F.3d 806 (8th Cir. 2011) .........................................................32, 33

*Pollard v. Fennell*,
   400 F.2d 421 (4th Cir. 1968) ...............................................................49

*Prior v. S.C. Med. Malpractice Liab. Ins. Joint Underwriting Ass'n*,
   407 S.E.2d 655 (S.C. Ct. App. 1991) .............................................23, 26

*Resolution Trust Corp. v. Artley*,
   24 F.3d 1363 (11th Cir. 1994) .............................................................27

## TABLE OF AUTHORITIES

**Page(s)**

*Roanoke Cement Co, L.L.C. v. Falk Corp.*,
    413 F.3d 431 (4th Cir. 2005) ................................................20

*S.C. Farm Bureau Mut. Ins. Co. v. Dawsey*,
    638 S.E.2d 103 (S.C. Ct. App. 2006) ..............................21, 22

*S.C. Nat'l Bank v. Lumbermens Mut. Cas. Co.*,
    526 F. Supp. 94 (D.S.C. 1981) ......................................24, 37

*Scarborough v. Ridgeway*,
    726 F.2d 132 (4th Cir. 1984) ...........................................20

*Sigma Fin. Corp. v. Am. Int'l Specialty Lines Ins. Co.*,
    200 F. Supp. 2d 710 (E.D. Mich. 2002) ...............................27

*Sorrentino v. IRS*,
    383 F.3d 1187 (10th Cir. 2004) ...............................38, 39, 40

*St. Paul Fire & Marine Ins. Co. v. Tinney*,
    920 F.2d 861 (11th Cir. 1991) ..........................................33

*St. Paul Fire and Marine Ins. Co. v. Metro.Urology Clinic, P.A.*,
    537 N.W.2d 297 (Minn. Ct. App. 1995) ...........................34, 35

*Stewart v. State Farm Mut. Auto. Ins. Co.*,
    533 S.E.2d 597 (S.C. Ct. App. 2000) ..................................22

*Utica Mutual Ins. Co. v. Hickman*,
    No. 3:99-cv-351-D, 2000 U.S. Dist. LEXIS 15779 (N.D. Tex. Oct. 24,
    2000) .....................................................................33

*Williams v. Sandman*,
    187 F.3d 379 (4th Cir. 1999) ...........................................20

*Wolfson v. Med. Care Availability & Reduction of Error Fund*,
    39 A.3d 551 ...............................................................35

*Worley v. Yarborough Ford Inc.*,
    452 S.E.2d 622 (S.C. Ct. App. 1994) ..................................23

# TABLE OF AUTHORITIES

**Page(s)**

**STATUTES**

28 U.S.C. § 1291 .................................................................................1

28 U.S.C. § 1332 .................................................................................1

**TREATISES**

19 Couch on Insurance 2d § 79:342 ...................................................23

**OTHER AUTHORITIES**

Fed. R. App. P. 4(a)(1)(A) ..................................................................1

Fed. R. Civ. P. 52(a)...........................................................................42

## JURISDICTIONAL STATEMENT

The District Court exercised subject matter jurisdiction over this insurance coverage dispute under 28 U.S.C. § 1332. The plaintiff, First Professionals Insurance Company ("FPIC"), is a Florida citizen; defendant and third party plaintiff, Kyrsten Sutton, M.D., is a South Carolina citizen; and the amount in controversy exceeds $75,000. Dr. Sutton then filed a counterclaim against FPIC and a third party complaint against The Medical Protective Company ("MedPro").

On May 1, 2013, the district court disposed of all claims in this action by entering a final judgment (i) in Dr. Sutton's favor on her third party complaint against MedPro, and (ii) in FPIC's favor on its complaint against Dr. Sutton and her counterclaim. MedPro appealed on May 30, 2013, and Dr. Sutton cross-appealed on May 31, 2013. This Court's jurisdiction thus rests on 28 U.S.C. § 1291, and these consolidated appeals are timely under Fed. R. App. P. 4(a)(1)(A).

## STATEMENT OF ISSUES

I.    Whether the district court ignored controlling South Carolina law when it expanded the scope of the "claims made and reported" coverage under the insuring agreement of the MedPro policy and disregarded the insured's contractual duty to report "all reasonably obtainable information" about a "potential claim."

II.    Whether the district court impermissibly relieved Dr. Sutton of her burden to prove that she reported a "potential claim" to MedPro under the terms of

-1-

her insuring agreement by accepting at face value her unsubstantiated, self-serving testimony that she called MedPro about an unusual letter she received in 2008 from a hospital regarding a former patient, Amy Moore.

III.    Whether the district court committed clear error when it failed to consider the self-serving nature of Dr. Sutton's testimony that she reported the contents of the 2008 letter to MedPro and instead speculated that MedPro's employees failed to enter Dr. Sutton's contact information into a computer.

IV.    Whether the district court denied MedPro a fair trial by overstepping its role as neutral factfinder and instead acting as an advocate for a position.

## INTRODUCTION

This appeal will decide whether an insured who fails to comply with an express requirement in the insuring agreement of a claims made and reported insurance policy to report a potential claim, is nonetheless entitled to insurance coverage. In finding coverage for Dr. Sutton, the district court re-wrote the reporting requirement in MedPro's insuring agreement to expand coverage for potential claims beyond the policy's plain and unambiguous language. This result is contrary to South Carolina law, which strictly construes contractual conditions precedent, and it also is contrary to the prevailing law nationwide that strictly construes reporting requirements in claims made and reported insurance policies.

Because of this fundamental legal error and other errors described below, MedPro is entitled to reversal of the district court's judgment and a judgment in its favor. At a minimum, MedPro should receive a new trial.

## STATEMENT OF THE CASE

The current dispute arises from an underlying medical malpractice action filed in South Carolina state court against Dr. Sutton (an obstetrician and gynecologist) on behalf of a child allegedly deprived of oxygen and injured during labor and delivery in 2004 (the "Nathan Moore Claim"). [JA0665] In 2011, after Dr. Sutton received a notice of intent to sue from Amy and Richard Moore, as parents and guardian *ad litem* for Nathan Moore (the "Moores"), she tendered the Nathan Moore Claim to her malpractice insurer, FPIC. [JA0656]

FPIC filed a complaint against Dr. Sutton in January 2012 seeking a judicial determination that it did not owe coverage for the Nathan Moore Claim under the terms of the FPIC insurance policy. [JA0001, JA0013] In its complaint, FPIC alleged that Dr. Sutton received a letter in 2008 from a hospital and reported it to her prior insurer, and that this letter and alleged report triggered several different exclusions in the FPIC policy. [JA0018-19]

Dr. Sutton, for her part, disputed FPIC's allegations and counterclaimed against FPIC. [JA0032-34]  She asserted that the 2008 letter from St. Francis

Hospital ("the 2008 St. Francis Letter") referred to Mrs. Moore, not Nathan Moore, and she lacked any knowledge of a potential claim to report to MedPro. [JA0033-34]  She filed a third party complaint against MedPro, which insured Dr. Sutton from 2003 to 2009 (when Dr. Sutton switched malpractice carriers from MedPro to FPIC). [JA0034-35]  Maintaining her consistent position throughout this litigation that FPIC owed coverage for the Nathan Moore Claim, Dr. Sutton pled against MedPro in the alternative. Even though she denied reporting a "potential claim" to MedPro in 2008, Dr. Sutton argued that the court nonetheless should find coverage under the MedPro policy, if it found her actions calling MedPro in 2008 somehow barred coverage under the FPIC policy. [*Id.*] The Moores intervened as defendants in connection with FPIC's complaint. They, too, contended that FPIC owed coverage for the Nathan Moore Claim. [JA0028-30, JA0037-69]

Because MedPro had no record of having receiving the alleged call from Dr. Sutton, and Dr. Sutton produced no evidence showing that the alleged call was made, MedPro moved for summary judgment under the insuring agreement of its policy. FPIC moved for summary judgment as well on its policy exclusions. After oral argument, the district court denied both motions on March 6, 2013. [JA0130-43]

As to MedPro, the district court determined that Dr. Sutton was not required to prove that she complied strictly (or at all) with the terms of the MedPro insuring

-4-

agreement with respect to coverage for a potential claim. Without considering any relevant South Carolina law, the district court held that Dr. Sutton's unsubstantiated recollection of calling MedPro about the 2008 St. Francis Letter regarding Mrs. Moore, not Nathan Moore, without a shred of evidence corroborating that she had made such a call, raised a fact issue that must be resolved in a trial. [JA0135-36] The district court then set the matter for a bench trial on March 25, 2013. [JA0127]

At trial, only two witnesses testified live: Dr. Sutton and Joseph Costy. Mr. Costy is MedPro's claims specialist in South Carolina. Four separate attorneys (one for each party at trial) questioned each witness; and the district court took an unusually active role in cross-examining the witnesses, particularly Mr. Costy. For example, the district court's cross-examination of Mr. Costy [JA0330-42] consumed double the number of pages of transcript as counsel for Dr. Sutton and the Moores *combined* [JA0321-27].

On May 1, 2013, the district court entered Findings of Fact and Conclusions of Law [JA0714-28] and Final Judgment [JA0729]. The district court's legal conclusions echoed its summary judgment opinion, and the factual findings tracked the court's questioning of Dr. Sutton and Mr. Costy at trial. According to the district court, Dr. Sutton testified "credibly" that she called MedPro about the contents of the 2008 St. Francis Letter regarding Mrs. Moore, and MedPro failed to

-5-

prove that its call center employees who receive initial claim reports from insureds were "incapable of human error or a failure to follow standard company procedures" to rebut Dr. Sutton's unsubstantiated recollection. [JA0718] Thus, according to the district court, Dr. Sutton through her own self-serving testimony met her burden to prove that she made the purported call to MedPro despite the lack of any corroborating evidence, such as telephone records, and undisputed testimony from MedPro that it had no record of the call. [JA0718-19]

The district court further concluded that, notwithstanding Dr. Sutton's failure to comply with the terms of the MedPro insuring agreement, and her own testimony that she did not intend to give notice of a potential claim for either Mrs. Moore or Nathan Moore when she allegedly called MedPro in 2008, her alleged call served as a "report" to MedPro to trigger coverage for the Nathan Moore Claim in 2011. [JA0723-25] Then, because Dr. Sutton had reported a potential claim to MedPro, regardless of Dr. Sutton's position on her lack of belief that a claim would be made by anyone, the district court found that the prior "report" negated coverage under the FPIC policy under one of its exclusions. [JA0726-27] The court did not reach two other exclusions raised by FPIC. This appeal followed. [JA0730-33]

-6-

## STATEMENT OF FACTS

**A.   Dr. Sutton's Medical Malpractice Insurance Coverage With MedPro (2003-2009)**

Dr. Sutton purchased medical malpractice insurance coverage from MedPro beginning on May 1, 2003 and renewed annually through May 1, 2009. [JA0150:19-21] The relevant Policy at issue is the last policy issued to Dr. Sutton for the term of May 1, 2008 to May 1, 2009. [JA0580]

The Policy is a "claims made and reported" policy. Under the Policy's insuring agreement, MedPro agreed to defend and to pay damages on the Insured's behalf:

A.  In any claim first made, or ***potential claim*** first brought to the Insured's attention during the term of this policy based upon professional services rendered, or which should have been rendered, after the retroactive date by the Insured [May 1, 2003][1], or any other person for whose acts or omissions the Insured is legally responsible, in the practice of the Insured's profession as hereinafter limited and defined.

***However, the Company shall have no duty to defend or pay damages:***

1.  on a claim unless it was reported to the Company during the term of this policy or thirty (30) days thereafter.

2.  ***on a potential claim unless it was reported to the Company during the term of this policy and the report includes all reasonably obtainable information, including the time, place***

---

[1] *See* JA0578 (setting retroactive date as "the date upon which this Insured's current, continuous coverage first became effective with this company on a claims made basis").

> ***and circumstances of the incident; the nature and extent of
> the patient's injuries; and the names and addresses of the
> patient and any available witnesses.***

[JA0592 (emphasis added)]

The Policy defines a "claim" as "an express written demand for money as compensation for civil damages." [JA0593] A "potential claim" is defined as "***an incident which the Insured reasonably believes will result in a claim for damages***." [*Id.* (emphasis added)]

### B.    MedPro's Easy, One-Step Intake Procedure For Claims And Potential Claims Reported Under The Policy

MedPro maintains a customer service center at its headquarters in Fort Wayne, Indiana to assist insureds in reporting claims and potential claims. [JA025:23-JA026:18] The call center intake process is as simple as it is straightforward: when an insured calls MedPro about a claim or potential claim, the representative finds the insured's policy number, locates the state and then generates an electronic "ticket" directed to the appropriate claims handler based on geography.  [JA0271:18-JA0272:7; JA0295:11-25] Here, that was Joseph Costy. Mr. Costy is the MedPro claims specialist with almost three decades of experience handling medical malpractice claims who handles all new and existing cases for MedPro insureds in the Carolinas. [JA071:7-9, JA0274:21-JA075:1]

As Mr. Costy described the intake process, he stated: "That's pretty much it. They fill out a screen with the phone numbers, the fax number and occasionally

they will pick up an email address." [JA0275:18-20] The call center employees are trained to do ***one job***, which is "to get [contact] information from the doctor so a claims handler can call the doctor back and discuss the case." [JA0283:16-JA0284:3] Their job is not to take down any details about claims or potential claims [JA0273:16-18, JA0274:13-20], but only to get contact information so that Mr. Costy can follow up:

> Q.    So even if a physician calls in to the call
>        center and gets a human, can they give the
>        details of the information? I guess they
>        certainly can. Is that the process?
>
> A.    That's not the process. They can, but the person
>        should be saying to them [the physician], I'm not
>        taking all this down, you need to talk to Mr.
>        Costy.
>
> Q.    And that's what they are trained to do.
>
> A.    Correct.

[JA0275:2-12]

The point of the call center intake is not to set up a claim, but to put the insured in touch with the appropriate claims handler, who then makes sure to obtain the information needed to "trigger" coverage, as Mr. Costy explained. [JA0269:22-JA027:14]  Until MedPro receives the information identified in the policy from an insured about any "claim" or "potential claim," the insured has not complied with the reporting requirement in the insuring agreement. [JA0287:3-5]

-9-

**C.    Mrs. Moore's Labor And Delivery in 2004 Was Not Troubling To Dr. Sutton and Did Not Result in a Claim Against Her During Any MedPro Policy Period**

In 2003 and 2004, Mrs. Moore was an obstetrics ***and*** gynecological patient of Dr. Sutton and her practice, Carolina Women's Care.  [JA0524] On June 22, 2004, Dr. Sutton assisted Mrs. Moore in the labor and delivery of her son, Nathan Moore. [JA0159:9-11] Mrs. Moore's labor progressed normally without any concerning issues, according to Dr. Sutton. [JA0171:1-9] At birth, however, baby Nathan was "purplish and . . . floppy" with the umbilical court wrapped one and a half times around his ankle.  [JA0171:19-24, JA0176:3-8; *see also* JA0563] Given his condition, baby Nathan was "intubated and given oxygen, suctioned, and had some chest compressions briefly" before taking his first breath at 18 minutes. [JA0173:12-24]

Dr. Sutton continued to treat Mrs. Moore after Nathan's birth and received encouraging news about his condition and prognosis. Just a few weeks later, Dr. Sutton noted, based on conversation with Mrs. Moore, "***Every day the baby seems to be making an improvement***, although the neonatologist and neurologist feel that the prognosis is essentially unknown and they expect him to have some sort of deficits, although it could be mild or very mild." [JA0184:5-JA0186:8 and JA0529 (emphasis added)] A few months later, Dr. Sutton reported further progress: "The baby has been doing very well and currently the pediatricians and

-10-

the pediatric neurologist are hopeful that the baby will have ***little or no residual [deficit]*** from presumed perinatal seizure disorder." [JA00532 (emphasis added); *see also* JA0187:13-JA0188:2] Based on these reports, Dr. Sutton concluded that "the baby was going to do great," [JA0187:19-20] and that his prognosis was "excellent." [JA0231:10-13] According to Dr. Sutton (and no one at trial disputed her testimony), babies presenting at birth like baby Nathan end up "perfectly okay" the "majority" of the time." [JA0209:14-21]

Dr. Sutton received no complaints from the Moores [JA0230:24-JA0231:2], and Mrs. Moore went back to Dr. Sutton for a tubal ligation in September 2004. [JA0533] Dr. Sutton did not learn that Nathan had been diagnosed with cerebral palsy or that he was developmentally delayed until seven years later in 2011, when an attorney for the Moores sent a notice of intent to sue Dr. Sutton for malpractice. [JA0239:15-25]

### D. Dr. Sutton Was Worried About Her Increasing Insurance Premiums When She Settled An Earlier, Unrelated Claim In Early 2008

The 2008 St. Francis Letter regarding Amy Moore's medical records, about which Dr. Sutton purportedly advised MedPro in 2008, arrived within a month after MedPro settled an unrelated claim from another patient, Katrina Arrington, on Dr. Sutton's behalf. [JA0192:23-JA0193:14] At this time, Dr. Sutton had a conversation with Mr. Costy about how the Arrington settlement would impact her

-11-

premiums. [JA0289:4-19] She was "worried" about her premium increasing, and she was right to be concerned, as Mr. Costy explained, her premium would increase as a result of losing her loss-free credit and because of the "hard market" for medical malpractice insurance. [JA0289:4-JA0290:12]

### E.   Dr. Sutton Received An "Unusual Letter" From A Hospital Risk Analyst In May 2008

Around May 23, 2008, Dr. Sutton received a letter from Nancy Morrow, Risk Analyst, regarding patient Amy F. Moore. [JA0596 (the "2008 St. Francis Letter")] and stating in full:

> As part of the ongoing Risk Management activities to identify potential claims within our health care system, we conduct routine review of attorneys' and patient requests for medical records received at Roper and St. Francis Hospitals. This is a courtesy notification than an attorney representing the above referenced patient has requested a complete copy of the records referenced above.
>
> The patient's complete medical record (and request) is available for your review in the Medical Records Department. Should you wish to review the records, please contact Medical Records at 402-2022. If you have any questions regarding the request, please contact me at the number listed above.

According to Dr. Sutton, she called MedPro after receiving the 2008 St. Francis Letter because "I thought it was an unusual letter and I wasn't sure what to do about it. It was just unusual. I mean, it said it was a routine, you

know, review, and I wasn't really sure what to make of it." [JA0169:21-JA0170:2][2]

She did not remember her patient, Amy Moore, at the time [JA0159:5-6], or even

whether she was an obstetrics or gynecological patient. [JA0209:8-10]  Indeed, she

did not recall anything about her treatment of Amy Moore. [JA00170:9-12] She

certainly did not associate the letter or the name "Amy Moore" with Nathan Moore

or his birth (which she did not remember, either). [JA0209:11-13] Dr. Sutton also

confirmed that the 2008 St. Francis Letter did not identify or describe any adverse

outcome, nor did she recall any adverse outcome. [JA0255:17-24]

    For these reasons, Dr. Sutton's trial testimony was both clear and consistent

that the 2008 St. Francis Letter "did not particularly concern me." [JA0208:5-9;

JA0157:17-21 (Dr. Sutton testifying that she was "not particularly" concerned

about the 2008 St. Francis Letter)] After all, she confirmed that it was "common"

for her patients to be involved in situations where a request for medical records is

made, such as by a defense attorney in an automobile accident case. [JA0208:10-

JA0209:2]

    Dr. Sutton testified that, though she called MedPro about the 2008 St.

Francis Letter, she never intended to report a potential claim under the MedPro

---

[2] See also JA0157:25-JA0158:3 (testifying that she called MedPro "because it was an unusual letter
that I hadn't had any familiarity with and I just didn't know what I should do with it, what it meant");
JA0232:24-JA-233:2 (referring again to the "unusual letter").

-13-

Policy, nor did she understand that the 2008 St. Francis letter reflected a potential

claim. This was confirmed in questioning from **_Dr. Sutton's own counsel_**:

```
     Q.  When you called MedPro back in 2008 with news
         that you had received a letter from St. Francis
         saying that St. Francis had received a medical -
         a request for records of Amy Moore, did you
         intend that call to be notice of a claim?

     A.  No.

     Q.  Did you intend that call to be notice of a
         potential claim?

     A.  No.
```

[JA0238:14-22][3] In fact, Dr. Sutton remembered precious little about the alleged

telephone call, other than "I believe I basically read the letter to them."

[JA0158:12-14] While Dr. Sutton testified that she called MedPro only because

she did not know what to do about the letter, she did not recall receiving any

advice from MedPro, and she did not follow up with MedPro about reporting the

letter. [JA0158:15-JA0159:4] She did not recall whether she spoke with a man or a

woman or what, if anything, the MedPro representative purportedly said in the

conversation. [JA0211:7-10]

---

[3] _See also_ JA0233:11-16 (Dr. Sutton confirming that she did not consider the 2008 St. Francis Letter to be notice of a likely claim against her for Nathan Moore); JA0234:12-15 (Dr. Sutton confirming that she did not believe that she would be sued for something that occurred in 2004 while she was insured by MedPro).

-14-

### F. Dr. Sutton Switched To Less Expensive Coverage from FPIC in 2009 And Received the Moore Claim in 2011

Dr. Sutton did not renew her coverage with MedPro at its expiration on May 1, 2009. Instead, Dr. Sutton switched to less expensive coverage from FPIC beginning April 1, 2009. [JA0228:3-9; JA0290:21-25] She was insured by FPIC until April 1, 2012, when FPIC non-renewed her coverage. [JA0151:12-15]

In May 2011, Dr. Sutton received notice of intent to sue from an attorney for the Moores, on behalf of Nathan Moore, who allegedly was injured during his labor and delivery because of Dr. Sutton's alleged malpractice and who subsequently was diagnosed with cerebral palsy. [JA0152:11-16] She promptly notified FPIC. [JA0152:14-16]

### G. FPIC's Coverage Investigation Caused Her To Testify That She Contacted MedPro In 2008 Regarding The Unusual 2008 St. Francis Letter

On May 10, Dr. Sutton spoke with a FPIC employee, Eric Roberts, who began questioning Dr. Sutton about whether she had reported the Moore Claim to a prior insurer. [JA0152:20-25] According to Dr. Sutton, she told Roberts: "I thought I received a notification from St. Francis that they had gotten a records request several years previously and that I wasn't sure if it was the same patient." [JA0156:9-15] She did not remember the insurer at the time, and she thought she had received the letter in 2007. [JA0654]

-15-

Roberts wasted no time writing MedPro and contending that Dr. Sutton had reported a "potential claim" to MedPro in 2007. [JA0655] According to FPIC, Dr. Sutton "personally recall[ed] reporting this incident to [MedPro] as a precautionary measure sometime in 2007 when she was insured there. Specifically, Dr. Sutton received a request for records from the representative of Nathan Moore in 2007 and met her policy requirement by notifying [MedPro] of a potential claim." [*Id.*] Dr. Sutton, however, made clear at trial that FPIC's characterization of her conversation with Roberts was false. [JA0156:6-8 (Q: "Is that what you had indicated to Mr. Roberts in your conversation?"; A: "I don't believe so.")] In any event, in response to FPIC's letter, MedPro searched exhaustively for, but did not locate, any record of Dr. Sutton reporting the 2008 St. Francis Letter. [JA0293:10-25]

FPIC then told Dr. Sutton that her malpractice coverage would not be renewed and that she would lose her malpractice coverage effective April 1, 2012. [JA0223:18-21 & JA0706] This both "scared" and "distressed" Dr. Sutton to the point where she wrote to Mr. Costy to ask him personally to look into her claimed prior report of the 2008 St. Francis Letter, and also to inquire whether MedPro might insure her again. [JA0223:22-25 & JA0706] In response, Mr. Costy noted that, "If you called [MedPro] back in 2007, there would have been a request for a written incident report to be completed or if a demand letter was sent we would

-16-

have requested a copy," and agreed to look for these records. [JA0706] As promised, Mr. Costy searched *again* for any record of Dr. Sutton's alleged telephone call—without success. [JA0285:8-17; JA0293:20-23] Mr. Costy confirmed that he was not aware of any situations where the call center failed to do its one job, in his own experience, and he was not aware of it happening to anybody.  [JA0285:18-JA0286:2]

## SUMMARY OF ARGUMENT

I.     The district court erred by not following controlling rules of South Carolina law when interpreting the MedPro Policy and its insuring agreement, including that an "Insured reasonably believe[]" an incident will result in a claim for damages," and the "potential claim" reporting requirement to provide "all reasonably obtainable information" to trigger coverage. In South Carolina, insurers have the right to limit their liability and to impose conditions on coverage, and courts are obligated to enforce those conditions, so long as they are unambiguous, clear and explicit, as they are here. As such, South Carolina law, just like numerous authorities from other jurisdictions, requires an insured to comply strictly with the reporting requirement in a claims made and reported policy when reporting potential claims. Because Dr. Sutton did not comply with the Policy's reporting requirement in the insuring agreement as written (indeed, by her own testimony, she never intended to report a potential claim under the MedPro Policy

-17-

when she allegedly called MedPro about the 2008 St. Francis Letter), MedPro was entitled to judgment in its favor as a matter of law. The cases cited by the district court requiring only "substantial compliance" with the policy's reporting requirements are inconsistent with South Carolina law and distinguishable in any event where, as here, the insured unquestionably did not advise MedPro of any essential facts giving rise to Dr. Sutton's potential liability to Nathan Moore.

II.      Not only did the district court incorrectly interpret the Policy's insuring agreement, but it also erroneously shifted the burden of proof to MedPro to disprove Dr. Sutton's uncorroborated, self-serving assertion that she called MedPro back in 2008. Under South Carolina law, Dr. Sutton had the burden to prove compliance with the Policy's reporting requirement in the insuring agreement. As a matter of law, her self-serving testimony standing alone without any credible supporting evidence, is insufficient to meet her burden of proof. Courts have recognized that, absent a bright-line rule, it is too easy for an insured like Dr. Sutton to "remember" telling an insurer something, leading to an expensive trial with uncertain results because of the inevitable credibility battle that ensues. The district court's rejection of such a bright-line rule and acceptance of Dr. Sutton's unsubstantiated testimony that she called MedPro in 2008, and thus "substantially complied" with the reporting requirement to trigger coverage for a

potential claim, is a separate and independent basis for reversing the district court's judgment as a matter of law.

III.    In addition to incorrectly interpreting the Policy under South Carolina law, the district court committed clear error by accepting Dr. Sutton's self-serving testimony, against all objective evidence, and by finding based on sheer speculation, that MedPro's call center failed to perform the ***one simple task*** assigned to it when receiving a telephone call from an insured. That task required only that the employee take the insured's contact information and enter it into a computer. In Mr. Costy's many years with the company, he never experienced or even heard of any break-downs or unreliability in the call center, and Dr. Sutton did not attempt to offer any evidence that MedPro's call center was unreliable. Moreover, the district court failed to acknowledge the entirely self-serving nature of Dr. Sutton's testimony or any of the multiple reasons she had to tell FPIC (and then maintain at trial) that she called MedPro in 2008. In these circumstances, the trial court's factual findings were not supported by substantial evidence and should be reversed.

IV.    Through the district court's extensive questioning of the witnesses at trial, the court improperly became an advocate for a position and denied MedPro a fair trial. MedPro acknowledges the district court's latitude to ask clarifying questions of witnesses even in the bench trial, but it is not without limits. Here,

-19-

even after four experienced attorneys questioned the witnesses at trial, the district court conducted its own extensive cross-examination. The trial judge's page after page of leading questions to Dr. Sutton and Mr. Costy then became the court's (erroneous) findings of fact. This was improper and grounds for a new trial.

## ARGUMENT

### I.  THE DISTRICT COURT ERRED AS A MATTER OF LAW IN ITS INTERPRETATION OF THE MEDPRO POLICY

#### A.  Standard Of Review

This Court "review[s] a judgment following a bench trial under a mixed standard of review—factual findings may be reversed only if clearly erroneous, while conclusions of law, including contract construction, are examined *de novo*." *Roanoke Cement Co, L.L.C. v. Falk Corp.*, 413 F.3d 431, 433 (4th Cir. 2005) (citing *Williams v. Sandman*, 187 F.3d 379, 381 (4th Cir. 1999); *Scarborough v. Ridgeway*, 726 F.2d 132, 135 (4th Cir. 1984)). *See also Fort Sumter Tours, Inc. v. Babbitt*, 66 F.3d 1324, 1332 (4th Cir. 1995) ("We review *de novo* the district court's construction of the contract") (citing *Nehi Bottling Co., Inc. v. All-American Bottling Corp.*, 8 F.3d 157, 162 (4th Cir. 1993)).

**B.    The District Court's Construction Of The MedPro Policy Contradicts Controlling South Carolina Principles Of Contract Interpretation And Should Be Reversed**

1.    **Under South Carolina Law, The Insured Has The Burden To Prove Strict Compliance With Express Conditions Precedent To Coverage**

From the outset, the district court disregarded cardinal rules of contract interpretation governing this insurance coverage dispute. Two principles here demonstrate why MedPro's interpretation of the Policy is correct, and the district court erred as a matter of law, by rewriting the Policy's insuring agreement to favor Dr. Sutton: (1) South Carolina courts enforce and uphold unambiguous limitations on insurance coverage, and they do not re-write insurance contracts to favor the insured, and (2) South Carolina courts strictly construe conditions precedent in contracts, including insurance policies.

a.    **The Court Should Enforce The Plain And Unambiguous Language Of A Parties' Contract**

Under South Carolina law, "[i]nsurance policies are subject to the general rules of contract construction." *M&M Corp. of S.C. v. Auto-Owners Ins. Co.*, 701 S.E.2d 33, 35 (S.C. 2010). As such, the court's function "is to enforce an insurance contract as made by the parties, and not to rewrite or to distort, under the guise of judicial construction." *S.C. Farm Bureau Mut. Ins. Co. v. Dawsey*, 638 S.E.2d 103, 105 (S.C. Ct. App. 2006) (internal quotation omitted). When a contract is unambiguous, clear and explicit, it must be construed according to the terms the

-21-

parties have used, *B.L.G. Enters., Inc. v. First Fin. Ins. Co.*, 514 S.E.2d 327, 330 (S.C. 1999), and "[a] court cannot torture the meaning of policy language to extend coverage not intended by the parties." *Dawsey*, 638 S.E.2d at 105 (citation omitted). "[A] contract is ambiguous 'only when it may ***fairly and reasonably*** be understood in more ways than one.'" *Bowman v. Std. Fire Ins. Co.*, 397 F. App'x 886, 888 (4th Cir. 2010) (quoting *Hansen v. United Servs. Auto. Ass'n*, 565 S.E.2d 114, 117 (S.C. Ct. App. 2002)) (emphasis added). *See also Stewart v. State Farm Mut. Auto. Ins. Co.*, 533 S.E.2d 597, 601 (S.C. Ct. App. 2000) (explaining that rules of construction do not "authorize a perversion of language or the exercise of inventive powers for the purpose of creating an ambiguity where none exists"). Furthermore, under South Carolina law, "[i]nsurers have the right to limit their liability and to impose conditions on their obligations provided they are not in contravention of public policy or a statutory prohibition." *Dawsey*, 638 S.E.2d at 104.

> b.    **Under South Carolina Law, Conditions Precedent Should Be Enforced Strictly, As Written**

This Court has stated that "conditions precedent must be proved by a plaintiff who seeks to recover on [an] insurance policy; [the] insured has [the] burden of proving satisfaction of policy obligations or waiver of them by insurer." *Nat'l Elec. Mfrs. Ass'n v. Gulf Underwriters Ins. Co.*, 162 F.3d 821, 826 (4th Cir.

1998) (citing 19 Couch on Insurance 2d § 79:342)). *See also Bruce v. U.S. Fid.&*

*Guar. Co.*, 277 F. Supp. 439, 443 (D.S.C. 1967) ("The law in this State is well

settled that the insured is under the duty to comply with the conditions of his

policies before he is entitled to coverage or benefits thereunder"). In South

Carolina, "[a] condition precedent to a contract is 'any fact other than the lapse of

time, which, unless excused, must exist or occur before a duty of immediate

performance arises.'" *Brewer v. Stokes Kia, Isuzu, Subaru, Inc.*, 613 S.E.2d 802,

805 (S.C. Ct. App. 2005) (quoting *Worley v. Yarborough Ford Inc.*, 452 S.E.2d

622, 624 (S.C. Ct. App. 1994)). Failure to comply with a policy condition defeats

coverage. *See Bryan Bros. Inc. v. Cont'l Cas. Co.*, 419 F. App'x  422, 426 (4th Cir.

2011) ("If the insured fails to comply with a clear condition required by the

insurer, it is typically not liable on the policy"). *See also Prior v. S.C. Med.*

*Malpractice Liab. Ins. Joint Underwriting Ass'n*, 407 S.E.2d 655, 657 (S.C. Ct.

App. 1991) ("Even if the Patient's claim had arisen from professional services,

JUA had no duty to defend because Prior failed to timely notify JUA").

   The South Carolina Supreme Court has held that a condition precedent is

satisfied only when a party can demonstrate ***strict compliance***, not merely

substantial compliance with the condition:

> Appellant argues that even if the contract contained a condition
> precedent requiring all owners to sign the contract, he substantially
> complied with this condition because eight of the nine contracts
> distributed were signed. We disagree. If a contract contains a

-23-

condition precedent, that condition must either occur or it must be excused before a party's duty to perform arises. In this case, before the closing could occur, the contract required all of the owners to sign the contract. This condition has not been met and has not been excused. ***Therefore, we hold that Appellant may not circumvent the contract's condition precedent by arguing substantial compliance***.

*McGill v. Moore*, 672 S.E.2d 571, 575 (S.C. 2009) (emphasis added) (citation

omitted).  *Cf. S.C. Nat'l Bank v. Lumbermens Mut. Cas. Co.*, 526 F. Supp. 94, 96

(D.S.C. 1981) ("In order to prove cancellation of an insurance policy (or, in this

case, notice to a lienholder), the party asserting cancellation bears the burden of

proving strict compliance with the manner provided for cancellation in the

policy").

Thus, as a matter of South Carolina law, the burden of proof for Dr. Sutton

is ***strict compliance*** with conditions precedent clearly stated in the MedPro policy.

> 2.     **Dr. Sutton As A Matter Of Law Has Not Established That She Reported a "Potential Claim" Under The Terms of the MedPro Insuring Agreement**

These basic principles of South Carolina law take on special importance here

given the insurance coverage provisions at issue, because the undisputed evidence

confirms that Dr. Sutton's alleged call, even if it occurred, did not strictly comply

with the terms of the policy requiring reporting of a "potential claim." Dr. Sutton's

policy offered "claims made and reported" coverage, which, simply stated, means

that the policy will cover claims made during the policy period and reported to the

-24-

insurer, even if the underlying act occurred years ago. [JA0267:16-JA0268:24][4] In

the FPIC policy, for example, Dr. Sutton was covered under the insuring

agreement, before considering any policy exclusions, for the Nathan Moore Claim

because it was asserted during the policy period, even though the alleged

malpractice occurred in 2004. [*See* JA0639 "Coverage Agreement" (covering

"**damages** because of **bodily injury** caused by a **medical incident**, which occurs

after the **retroactive date** and prior to the end of the **policy period** stated in the

Coverage Summary resulting from . . . **Your** providing or failure to provide

**professional services t**o a patient"; *see also* JA0641 "Claims Made and Reporting

Requirements" ("This **policy** applies only to . . . **claims** first made against an

**insured** and reported to **us** in writing during the **policy period** stated in the

Coverage Summary"); JA0636 (defining "**Claim**" to include "a notice of intent to

initiate litigation")]

　　　In addition, claims made and reported coverage *by its terms* can extend to

*potential claims* reported during the policy period, even if a formal claim has yet to

be asserted. Thus, here, the MedPro Policy also provides coverage for a "potential

claim" reported during the Policy Period under the limited circumstances set forth

---

[4] *See also GS2 Eng'g & Envtl. Consultants, Inc. v. Zurich Am. Ins. Co.*, No. 3:12-cv-02934-CMC, 2013 U.S. Dist. LEXIS 95137 (D.S.C. July 9, 2013) (noting that the "basic nature of claims-made-and-reported policies requires that claims be both made against the insured and reported to the insurer during the same policy period").

in the insuring agreement. [JA0592] As defined in the Policy, "potential claim" means "an incident which the Insured *reasonably believes* will result in a claim for damages." [JA0593 (emphasis added)] Under the insuring agreement, an Insured who has a "potential claim," i.e., an incident that the Insured reasonably believes could result in a claim, must report the incident to MedPro including "***all reasonably obtainable information***, ***including the time, place and circumstances of the incident; the nature and extent of the patient's injuries; and the names and addresses of any available witnesses.***" [JA0592  (emphasis added)]

These reporting requirements are integral to and defining features of the "claims made" coverage at issue here, and Dr. Sutton had to strictly comply with them.  *See, e.g., Bryan Bros.*, 419 F. App'x  at 426; *Prior*, 407 S.E.2d at 657. Consistent with South Carolina law, numerous courts enforce reporting requirements strictly, as written, for claims and potential claims. *See Doctors Co. v. Health Mgmt. Assocs. Inc.*, 943 So. 2d 807, 809-10 (Fla. Dist. Ct. App. 2006). *See also First Am. Title Ins. Co. v. Continental Cas. Co.*, 709 F.3d 1170, 1175-76 (5th Cir. 2013) ("In light of the delicate balance in these polices, we strictly construe notice and reporting requirements in claims-made policies because of their important role in defining the scope of the bargained-for agreement and providing predictability to the insurer."); *Am. Cas. Co. of Reading, Pa. v. Continisio,* 17 F.3d 62, 69 (3d Cir. 1994) ("Because notice of a claim or potential

claim defines coverage under a claims-made policy, we think that the notice

provisions of such a policy should be strictly construed") (quoting *FDIC v.*

*Barham,* 995 F.2d 600, 604 n.9 (5th Cir. 1993)); *Harbor Ins. Co. v. Cont'l Bank*

*Corp.,* 922 F.2d 357, 369 (7th Cir. 1990) (failure to provide written notice fatal to

claim for coverage because insured failed to comply with explicit condition

precedent to coverage); *Sigma Fin. Corp. v. Am. Int'l Specialty Lines Ins. Co.*, 200

F. Supp. 2d 710, 718 (E.D. Mich. 2002) ("[N]otice under a 'claims made' policy

must be made with sufficient specificity. . . . [r]elaxing the notice requirement,

allowing coverage to be triggered by broadly phrased, innocuous, or non-specific

statements, would permit an unbargained-for expansion of the policy, undermining

the key distinguishing characteristic of a claims made policy—reduced exposure

for the insurer and lower premiums for the insured.") (citing *McCullough v. Fid.&*

*Deposit Co.*, 2 F.3d 110, 112 (5th Cir. 1993); *Resolution Trust Corp. v. Artley*, 24

F.3d 1363, 1368 (11th Cir. 1994); *LaForge v. Am. Cas. Co. of Reading, Pa.*, 37

F.3d 580, 583 (10th Cir. 1994)).

In particular, courts have found that the ***only reasonable interpretation*** of

these types of reporting requirements, because they define the scope of coverage

under the policies, "is that the insureds must regard the information they possess as

a potential claim and formally notify their insurer through its claims liability

department that a claim may be asserted." *LaForge v. American Casualty Co*., 37

-27-

F.3d 580, 583-584 (10th Cir. 1994) (citing *Continisio*, 17 F.3d at 69). *See also*

*FDIC v. Mijalis*, 15 F.3d 1314, 1335 (5th Cir. 1994) ("[T]he proper focus of the

district court's inquiry is whether the insured has objectively complied with such a

notice provision, and not whether the insurer has subjectively drawn inferences

that potential claims exist from the materials submitted by the insured").

   Furthermore, where, as here, an insured explicitly disavows that she ever

meant to report a potential claim to the prior insurer, the insured's admission is

"fatal to subsequent claims." *Am. Cas. Co. v. FDIC*, 821 F. Supp. 655, 663-664

(W.D. Okla. 1993) ("[I]t was only two days later in an application to BancInsure

that the insureds themselves disavowed giving any notice of claims or potential

claims when they represented that they were aware of no occurrences that could

give rise to any future claims. Such representations are fatal to subsequent claims"

(citing *FDIC v. Cont'l Cas. Co.*, 796 F. Supp. 1344, 1352 (D. Or. 1991)), *aff'd*, 33

F.3d 62 (10th Cir. 1994). The reason for this bright-line rule is simple:

> Taking FDIC's argument to its logical conclusion would result in a
> situation where the bank directors and officers would be better served
> to disguise potential claims so that they would be covered by
> insurance well into the future while not drawing attention to conduct
> that might increase future premiums, or terminate coverage altogether.
> ***Such a result is unconscionable.***

*Id.* at 664 (emphasis added).

   This rationale is particularly apt here, where, at the time Sutton received the

2008 St. Francis Letter, she was painfully aware of how reporting a claim

increased her premium, and she was looking for, and obtained, less expensive coverage from FPIC. Because Sutton expressly disclaimed to **both** of her insurers any intention of reporting a potential claim to MedPro when she allegedly called in 2008, it was "unconscionable" for the district court to treat the call as such a report contrary to the MedPro Policy reporting requirement, and more importantly, Dr. Sutton's explicit testimony. *Id.*

In fact, what the district court did was to write a brand new insurance policy for Sutton, one that contained none of the requirements that she actually agreed to in the MedPro insuring agreement, and essentially changed the claims made and reported policy into an occurrence policy without the appropriate increase in premium. It is undisputed that (i) Dr. Sutton repeatedly disclaimed reporting a "potential claim" as defined in the MedPro Policy,[5] (ii) Dr. Sutton never believed that the 2008 St. Francis Letter described an incident that would result in a claim for damages (see n.4, above), (iii) Sutton did not report "all reasonably obtainable information, including the time, place and circumstances of the "incident"; the

---

[5] *See* JA0079 ("Dr. Sutton never testified that she reported a potential claim"). *See also* JA0389:4-6 ("The point is that Dr. Sutton did not intend to report a claim when she sent -- when she notified Med Pro of the request for medical records from St. Francis"); JA0390:6-8 ("My personal feeling is I think that it was not intended to be a claim to MedPro"). JA0387:18-JA0388:6 (""[H]er position is and always has been she did not notify Med Pro of a claim. *She did not think it was a claim, had no reason to believe there was a claim. And there is no evidence before this Court, regardless of what experience you might have with some of us other attorneys may have, there is no evidence before this Court from which you can conclude that she should have realized it was a claim.*" (emphasis added)

-29-

nature and extent of the patient's injuries; and the names and addresses of any available witnesses" despite the invitation in the 2008 St. Francis Letter to come down to the hospital, which was local to Dr. Sutton, to review Mrs. Moore's records request [JA0596], and (iv) the 2008 St. Francis Letter did not identify Nathan Moore as the claimant or otherwise identify any potential claim involving Mrs. Moore's labor and delivery for Dr. Sutton to even suspect a potential claim by Nathan Moore. [*Id.*]

Despite these many deficiencies, the district court found that Dr. Sutton "reported" a potential claim to MedPro during her last policy period with MedPro when she purportedly called regarding the "unusual" 2008 St. Francis Letter and its contents, even though she testified that she did not intend to report a potential claim and was not aware of one by Mrs. Moore, let alone Nathan Moore.

The ostensible basis for the district court's holding was its incorrect belief that the insuring agreement "raises the question of whether the words following 'including' are a non-negotiable minimum to constitute notice or simply examples of the type of information an insured might provide *if* 'reasonably obtainable.'" [JA0273] Even though *none* of the parties argued that the MedPro insuring agreement was ambiguous at any point during the lawsuit, the district court concluded *sua sponte* that the language was ambiguous and that Dr. Sutton "was obligated to provide to the carrier 'all reasonably obtainable information' *then*

***available to her*** and not specifics regarding the claim, the patient's injuries, or other facts which she was then unaware and had no immediate access to such information." [JA0274 (emphasis added)] Of course, the MedPro Policy does not qualify the reporting requirement in the insuring agreement in the way the district court found—the court simply added its own language to the contract. The district court also ignored altogether the requirement in the policy that the insured "reasonably believes [that the incident] will result in a claim for damages." [JA0593] These are not difficult words for the insured to understand or difficult tasks for an insured to perform when invoking coverage under an insurance policy. It is, after all, the insured's affirmative burden to prove that she complied with all conditions precedent to coverage and that her report of a "potential claim" falls within the Policy's insuring agreement. And it is the court's role to enforce clear policy language, not to expand or relax that language or to disregard the insured's own admission that she never intended to report a potential claim.

3. **The District Court's Authority Is Inconsistent With South Carolina Law and Distinguishable**

Instead of applying black letter South Carolina law, the district court turned to out-of-state cases relaxing the policy reporting requirements. According to the district court: "[w]hile courts generally have enforced notice requirements under claims made policies, they have also generally been unwilling to impose strict compliance with substantive requirements of notice set forth in such policies where

-31-

timely notice provided the carrier sufficient information to alert the insurance company of a potential claim within the policy period." [JA0721-22] As a statement of the law, this is incorrect. Many courts have enforced notice provisions as written without revising or relaxing the notice requirement, including the cases discussed above.

Even those minority jurisdictions that have relaxed the reporting requirements for potential claims have done so in circumstances markedly different from those here. In each of the six cases cited in the district court's opinion (cases contrary to South Carolina law to the extent they fail to enforce a clear condition precedent to coverage) the insured's reporting in question was far more detailed than Dr. Sutton's alleged "reporting" here—which, again, even she rejected as a "report."

Starting with *Owatonna Clinic-Mayo Health System v. Medical Protective Co. of Ft. Wayne, Ind.*, 639 F.3d 806, 811-12 (8th Cir. 2011) (applying Minnesota law), the insured clinic sent a letter to MedPro enclosing "Notice of Conference from the Minnesota Board of Medical Practice" informing Dr. Charles Chambers, a clinic employee, that he was under investigation for his care of five patients, including a pregnant patient for whom Dr. Chambers misread an ultrasound resulting in injury to the baby. *Id.* at 811. As explained to MedPro, "the Board's medical consultant believed that Dr. Chambers' diagnosis and treatment had

-32-

constituted a 'deviation from acceptable OB ultrasound standards of care." *Id.*
While MedPro opened a claim for the doctor, it did not open a claim for the clinic.
The Eighth Circuit found this report sufficient, but not in strict compliance with the
reporting requirement, to alert MedPro of a potential claim against the clinic. *Id.*

In *St. Paul Fire & Marine Insurance Co. v. Tinney*, 920 F.2d 861 (11th Cir.
1991), the insured received a demand letter, and promptly forwarded it to the
insurer, from an attorney representing three different clients whom the insured had
treated for cataracts and included suit papers for one client. Thus, the letter
identified for the insurer "the professional services performed, the type of claims
anticipated, and the names of the injured parties." *Id.* at 863. Indeed, the court
noted: "***We would be hard pressed to find a stronger statement of the likelihood
of litigation against [the insured]*** for medical malpractice than is contained in [the
attorney's letter] . . . which was brought to the attention of [the insurer]." *Id.*
(emphasis added).

*Utica Mutual Insurance Co. v. Hickman*, No. 3:99-cv-351-D, 2000 U.S.
Dist. LEXIS 15779, at *4 (N.D. Tex. Oct. 24, 2000), did not involve a "potential
claim" at all but rather notice of a lawsuit. There, the district court held that notice
of a lawsuit by one insured was sufficient to trigger coverage for co-insured who
also was a defendant in the same lawsuit. *Id.* at *11-12.

-33-

In *Federal Savings and Loan Insurance Corp. v. Burdette*, 718 F. Supp. 649 (E.D. Tenn. 1989), the insurer received ***two*** separate notices of likely claims against officers and directors of a failed savings and loan association who allegedly did not properly supervise officers and employees for events occurring after a certain date; ***and the insurer acknowledged the notice and opened a claim file***. *Id.* at 653-54. Having opened a claim file based on the letters, the insurer could not thereafter assert that the initial notice was insufficient, but only as to the specific events identified in the letters. *Id.*

In *Landry v. Intermed Insurance Co.*, 292 S.W.3d 352 (Mo. Ct. App. 2009), the insured provided written notice to the insurer shortly before the end of the policy period of multiple potential claims, including the name of the injured party, the time, place and circumstances of the injury and the extent of the type of claim anticipated. *Id.* at 354. After inquiry by the insurer, the insured further clarified that each of the incidents involved either a misdiagnosis or bad outcome. *Id.* at 358. Indeed, for the claim in question, the insured's notice specifically identified an ***alleged missed diagnosis of "acute myocardial infarction"***—a heart attack. *Id.* Thus, this notice provided the "essential fact" on which the insured's potential liability was based. *Id.*

Finally, in *St. Paul Fire and Marine Insurance Co. v. Metropolitan Urology Clinic, P.A.*, 537 N.W.2d 297 (Minn. Ct. App. 1995), the insured called the insurer

to report a request for medical records of a former patient who was experiencing a kidney blockage as a result of a surgery performed by the insured. The insured's notice, as **documented contemporaneously in the insured's files**, specifically advised the insurer of the possibility of the patient bringing a malpractice action. *Id.* at 300. According to the court, this "unquestionably" was "notice [to the insurer] of the existence of a possible claim." *Id.*

The common thread throughout each of the non-South Carolina decisions cited in the district court's opinion is that, even though the insured did not comply with every last requirement in the notice condition, the insured **believed** a potential claim would be made; gave the insurer the **essential facts** underlying the basis for a probable claim, including the injury and professional services involved and the name of the claimant; and **clearly identified** the report to the insurer as a potential claim. Here, on the other hand, **Dr. Sutton did not believe** any potential claim would be made; and **failed to provide any information** pertinent to liability, such as the nature of the treatment she provided to Mrs. Moore and resulting injury to Nathan Moore, who was not mentioned anywhere in the 2008 St. Francis Letter. As several witnesses noted at trial, a medical records request does not always (or even usually) indicate a likely malpractice claim.[6]

---

[6] [JA0208:10-JA0209:6 (Dr. Sutton); JA0208:15-JA0209:6 (FPIC underwriter); JA0448:11-22 (FPIC claims adjuster)] *See also Wolfson v. Med. Care Availability & Reduction of Error Fund*, 39 A.3d

-35-

Even crediting Sutton's testimony that she would have given MedPro the information in the 2008 St. Francis Letter (***Amy Moore's*** name, the date of treatment, and the fact she received the notice from St. Francis as part of its "routine review" of medical record requests), this still provided no information about the nature of a potential malpractice claim and ***no*** information relating to the facts that she "reasonably believes will result in a claim for damages." Again, in fact, Dr. Sutton did not regard the 2008 St. Francis Letter as informing her of a potential claim at all. In these circumstances, the cases cited in the trial court's opinion do not support the judgment against MedPro.

## II.    THE DISTRICT COURT IMPERMISSIBLY SHIFTED THE BURDEN OF PROOF TO MEDPRO TO DISPROVE DR. SUTTON'S SELF-SERVING ASSERTION OF CALLING MEDPRO AFTER RECEIVING THE 2008 ST. FRANCIS LETTER

### A.    Standard Of Review

This legal issue is subject to the *de novo* standard of review. *See above* at Argument I.A.

---

551, 558 (Pa. 2012) (holding that insured's notice of a medical records request from an attorney representing a patient who had died, giving only the date of treatment and date of death and no other details, was "much too vague to constitute the reporting of a professional liability claim"); *N. Am. Specialty Ins. Co. v. Correctional Med. Servs., Inc.*, 527 F.3d 1033, 1044 (10th Cir. 2008) (noting that medical records request "did not specifically convey to [the insured] that a medical malpractice would— or even might—be filed in the future").

**B.    Dr. Sutton's Uncorroborated, Self-Serving Testimony Is Insufficient As a Matter of Law to Sustain Her Burden to Prove Coverage Under the MedPro Policy**

At the summary judgment stage, and then again at trial, Dr. Sutton relied on nothing but her own testimony to prove that she called MedPro after receiving the 2008 St. Francis Letter. MedPro had ***no*** business record of getting such a call from her, and she offered no objective, credible evidence, including any phone record, to reflect even the ***fact*** of a call from her to MedPro. The district court purported to weigh the conflicting evidence, Dr. Sutton's self-serving testimony against MedPro's lack of business records, before finding in her favor when MedPro ostensibly had no evidence to disprove a negative fact. As a matter of law, however, Dr. Sutton's uncorroborated testimony was insufficient to carry her burden of proof under the Policy's insuring agreement reporting requirement. *See S.C. Nat'l Bank*, 526 F. Supp. at 95-96 (finding that insurance company did not meet its burden of proving that it mailed notice of cancellation of an insurance policy to the insured's lienholder, its bank, where the only evidence offered was uncorroborated testimony); *Feldman v. Charlotte-Mecklenburg Bd. Of Educ.*, No. 3:11-cv-34-RJC-DSC, 2012 WL 3619078 (W.D.N.C. Aug. 21, 2012) (dismissing disability action on summary judgment: "Courts should put aside self-serving testimony from a plaintiff where it is unsupported by corroborating evidence and undermined by other credible evidence.") (citing *Blue v. U.S. Dep't of Army*, 914

-37-

F.2d 525, 539 (4th Cir. 1990); *Gray v. Spillman*, No. 91-7199, 993 F.2d 1537, 1993 SL 165039, at *3 (unpublished table decision) (4th Cir. May 17, 1993)).

The very purpose of a bright line rule about notice under a claims-made policy "is to prevent disputes over whether notice was received." *Aqua Bar & Lounge, Inc. v. United States*, 438 F. Supp. 655, 657 (E.D. Pa. 1977), *quoted in Am. Cas. Co. v. FDIC*, 821 F. Supp. 655, 664 (W.D. Okla. 1993). "That is the very evil intended to be prevented. What is at stake here is that insurance companies will become forever embroiled in costly and time-consuming litigation if a bright-line decision is not developed." *Am. Cas.*, 821 F. Supp. at 664.

This same "evil" is also reason to reject the Insured's attempt to create a fact issue about notice solely through her own self-serving testimony. Numerous courts have rejected self-serving testimony as insufficient to trump objective contrary evidence. For example, courts have held that uncorroborated testimony by a taxpayer of filing a tax return is insufficient as a matter of law to meet their burden to show that a return was mailed. *See Sorrentino v. IRS*, 383 F.3d 1187, 1195 (10th Cir. 2004) (holding that taxpayer seeking to invoke the common law "mailbox rule" must offer independent proof of a postmark, dated receipt or evidence apart from plaintiff's self-serving testament of mailing to create the presumption of timely delivery under the mailbox rule). The court in *Sorrentino* recognized that "[a]llegations of mailing are easy to make and hard to disprove." *Id.* at 1194.

-38-

Moreover, the court considered and expressly rejected any argument that an uncorroborated claim of mailing creates a fact issue for a jury. The court held that "absent some proof of an actual postmark or dated receipt, a presumption that tax documents allegedly mailed to the IRS were in fact received does *not* arise based solely upon a taxpayer's self-serving testimony." *Id.* at 1195. As the court explained, "Despite [the dissent's] contrary assertion, ***such a holding does not require a credibility determination***. Rather, ***such testimony alone, assuming its truth, is insufficient as a matter of law*** to establish a presumption of timely delivery." *Id.* (emphasis added). Accordingly, the court reversed the district court's opinion and remanded with instructions to dismiss. *Id.*[7]

Similarly, in *Myers v. Dolgencorp, Inc.*, No. 04-4137, 2006 U.S. Dist. LEXIS 6559, at *23-*24 (D. Kan. Feb. 15, 2006), the district court dismissed a plaintiff's employment claim on summary judgment, finding that the plaintiff could not meet her burden of proving that she had provided her employer with a certification required under the Family Medical Leave Act ("FMLA"). *Id.* The court rejected the plaintiff's bare assertion of mailing a certification under FMLA as "***wholly unsupported or corroborated by independent evidence***," explaining that "she has no copy of the purported FMLA paperwork that she claims to have

---

[7] Other courts have reached similar results in taxpayer cases. *See, e.g., In re Pizzuto*, No. 99-5073, 384 B.R. 105, 111-12 (Bankr. D.N.J. 2008).

-39-

mailed, nor does she have a receipt of mailing or dated postmark." *Id.* (emphasis added) (citing *Sorrentino*, 383 F.3d at 1195).

The rationale of these cases applies with equal force here, where the insured had the burden to prove the trigger of coverage under a claims made and reported insurance policy. The district court's decision shows just how easy it is for an insured to allege that notice was given, and just how hard it is for an insurance company to prove the negative.

Dr. Sutton understood the significance of giving notice of a potential claim given her experience with the unrelated Arrington claim.[8] She surely knew, given her claims history by 2011, that FPIC was not asking her these questions about record requests and potential claims out of idle curiosity, and that her answers would have a direct impact on her coverage with FPIC for the Nathan Moore Claim, and maybe her future coverage with FPIC. In these circumstances, it was, just as the court predicted in *Sorrentino,* very easy for Dr. Sutton to "remember" calling MedPro and then to testify that she "would have" provided the contents of the 2008 St. Francis Letter in a telephone call to MedPro, because Dr. Sutton

---

[8] Dr. Sutton's office manager reported the Arrington matter to MedPro in September 2006 as a potential claim after receiving a request for medical records addressed to Dr. Sutton at Carolina Women's Care. [JA0161:18-JA0163:10, JA0568-71] Dr. Sutton later received a notice of intent to sue from Mrs. Arrington's attorney. [JA0163:14-16] Dr. Sutton herself tendered the matter—now a claim—to MedPro [*see* JA0573], which eventually settled the Arrington claim with Dr. Sutton's consent. [JA0290:11-12]

-40-

feared that FPIC would deny coverage, which it subsequently did. And this testimony resulted in a trial and then a judgment in her favor against MedPro.

In short, Dr. Sutton's uncorroborated, self-serving testimony and MedPro's ostensible failure to prove a negative—that Dr. Sutton did not make the telephone call—resulted in an unbargained-for expansion of Dr. Sutton's claims made and reported coverage, and MedPro suddenly became liable for a claim tendered several years after its Policy expired. This is, indeed, the very "evil" that bright-line notice rules should prevent. Sutton's failure to produce any credible objective evidence to corroborate her testimony should not have resulted in a trial and then a judgment in her favor. It should have resulted in outright dismissal of her third party complaint against MedPro.

## III.   THE DISTRICT COURT'S FINDING THAT SUTTON REPORTED A POTENTIAL CLAIM TO MEDPRO IS CLEARLY ERRONEOUS

The district court committed clear error finding that Dr. Sutton reported a "potential claim" to MedPro by allegedly calling about the 2008 St. Francis Letter because it is not supported by any objective evidence and is based on speculation by the district court that the MedPro call center employees failed to do the ***one simple job*** assigned to them.

### A.   Standard of Review

On appeal from a bench trial, the Court may set aside findings of fact only if they are clearly erroneous and must give due regard to the opportunity of the

-41-

district court to judge the credibility of the witnesses. *See* Fed. R. Civ. P. 52(a). A factual finding is clearly erroneous where, "although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Jiminez v. Mary Washington College*, 57 F.3d 369, 379 (4th Cir. 1995) (internal quotation omitted). If the district court has "ignored substantial evidence or failed to evaluate substantial contrary evidence in making its findings of fact," then the Fourth Circuit will reverse a factual determination. *Id.* at 384.

**B.    The District Court Erroneously Accepted Dr. Sutton's Self-Serving Testimony That She Reported The 2008 St. Francis Letter To MedPro Despite The Lack of Credible Supporting Evidence And Overwhelming Evidence To The Contrary**

The district court's factual findings ignored or contradicted the uncontroverted objective evidence of MedPro's intake process for telephone calls from insureds such as Dr. Sutton. As Mr. Costy explained, and he was unrebutted, the MedPro call center employees have ***one job*** when receiving a call from an insured: look up the insured's policy number and open a ticket that automatically generates an email to Mr. Costy's secretary. *See* Statement of Facts, at B. For claim information, the call center transfers the call to Mr. Costy with instructions to the insured to listen to the voicemail message if Mr. Costy does not answer. [JA0273:13-JA0274:20]  These are simple steps clearly designed to avoid the

-42-

"human error" that the district court speculated happened here. Yet, the district court considered none of this testimony.

The district court also ignored Mr. Costy's uncontroverted testimony establishing that placing a call to the call center does not open a claim or potential claim under the MedPro policy. In fact, he testified that he will "start an investigation" of the issue so that they will be able to determine whether the issue will evolve into a claim. [JA0270:24-JA0271:13] Further, he testified that receipt of a request for medical records does not constitute a claim. [JA0282:5-18] He explained that, to constitute a potential claim he would need to see the information "outlined in our policy…the time of the event, the place and circumstances of the event, the nature and extent of the patient's injuries and the names and addresses of the patient and testimony, and any available witnesses."[9] [*Id.*] If the insured does not provide additional information, such as the medical records, operative notes or chart notes, no claim has been made under the policy. [JA0286:7-JA0287:5] Moreover, Mr. Costy stated that the letter from St. Francis, in and of itself, would not constitute proper notice under the policy, explaining:

```
Well, I don't know what a visit is, first of all. So I
don't know what kind of care is provided, what
```

[9] During questioning by FPIC's counsel, Mr. Costy testified that he will take a call about a bad outcome as a report "once they send me information or a copy of their discharge sheet or something like that." [JA0313:16-22] Further, "if somebody requested from me, sent to me a request for records, I wouldn't classify it as anything until I got some information from them and then I would make a decision after talking to them." [JA0315:11-21]

> occurred. I have no idea who witnessed it. Don't know—
> I don't have much feel with his letter as to what
> occurred in that this comes from a hospital and my
> doctor works for a practice. So I need to know a lot
> more so I better understand what's going on because I
> don't know if a doctor made an error or if a nurse
> working next to the doctor made an error. I don't
> know. So there is a lot more information I need to
> gather before I can set up an incident for this.

[JA0288:5-22]  According to Mr. Costy, MedPro requires its insureds to provide

adequate information in reporting a potential claim for several reasons: (1) to

ensure that there is a record of the potential claim if Mr. Costy is no longer with

MedPro; (2) to make decisions regarding the renewal of the insured's policy; and

(3) to determine the potential exposure and set reserves. [JA0270:8-20] Also, he

stated that "a letter for Amy Moore saying, I'm requesting records would not be

notice for Nathan Moore, it would be notice for Amy Moore." [JA0294:15-19]

       In addition to ignoring Mr. Costy's testimony about MedPro internal

processes, the district court failed to address serious problems with Dr. Sutton's

testimony. The district court did not consider that Dr. Sutton provided no

competent evidence other than her own self-serving testimony to rebut MedPro's

lack of business records showing her alleged report. The Court ignored

Dr. Sutton's testimony that she was worried about increased insurance premiums

or about losing her malpractice coverage if she reported another claim to FPIC, and

the potential that both those fears would have impacted her testimony regarding

whether she called MedPro after receiving the 2008 St. Francis letter or what she advised FPIC during its renewal of her FPIC policy.

For example, in 2008, Dr. Sutton was communicating directly with Mr. Costy about the Arrington claim, which had been preceded by a notice of potential claim from Carolina Women's Care. At the time of the Arrington settlement, Mr. Costy and Dr. Sutton discussed how the settlement would likely increase her premiums. He explained: "[It] was a hard market, so we were underwriting people…she would have lost her loss free credit with us. There probably would have been an increase above that as well." [JA0289:4-JA0290:12] He explained that they had this conversation because Dr. Sutton "was worried about how it would affect her premiums." [JA0290:7-8] When, just a few weeks after this conversation with Mr. Costy, Dr. Sutton received the 2008 St. Francis Letter [JA0193:11-19], she would have reason not to report the letter to MedPro because it would further increase her premiums. For the same reason, she might not have wanted to disclose receipt of the letter on her application for coverage from FPIC.

Indeed, the trial court failed to even acknowledge or consider the self-serving nature of Dr. Sutton's testimony. Of course, when the Moores' counsel issued their notice of intent to sue in 2011, Dr. Sutton dutifully reported it to FPIC, which then began making troublesome inquiries about whether Dr. Sutton had

received a request for medical records in connection with Mrs. Moore's labor and delivery. ***She had received the 2008 St. Francis Letter***. Upset and "distressed" by FPIC's tactics, Dr. Sutton was compelled to look elsewhere for coverage for the Moore Claim and into the future. [JA0706 ("At any rate, FPIC is now denying to continue my coverage because of this. I will lose my malpractice coverage as of April 1, 2012. I had no idea this would turn into such a nightmare…This is, of course, extremely distressing.")]

She began over-reporting matters to FPIC, such contact by a divorce lawyer involving one of her patients, exacerbating her problem of insurability in the aftermath of the Nathan Moore Claim. [JA0190:20-JA0192:18] In these circumstances, Dr. Sutton had a number of reasons to maintain her story of having contacted MedPro in 2008, even if she had not, as reflected in MedPro's records. Because she stuck to her claim through trial of having contacted MedPro regarding the 2008 St. Francis Letter (even though she also never thought the 2008 St. Francis letter reflected a potential claim), she created an argument for coverage of the Nathan Moore Claim under the MedPro Policy in the event she did not prevail against FPIC.

Yet, despite these many obvious problems with Dr. Sutton's self-serving testimony, the district court looked for reasons to doubt the reliability of MedPro's call center. Indeed, the district court on its own initiative speculated as to how

-46-

MedPro's call center employees could have mishandled Dr. Sutton's alleged telephone call in 2008. In this regard, the district court asserted that there was some turnover among the call center personnel and that trainees sometimes answered calls [JA0718]; however, the court ignored Mr. Costy's unrebutted testimony that the trainees were supervised until training was complete [JA0326:21-23], and the only supposed evidence of turnover was Mr. Costy's testimony that one call center employee with whom Mr. Costy recently has been talking has been on the job for about a year. [JA0297:12-19] The district court also stated that it had received "no evidence regarding the recording of any calls to the [MedPro] call center." [JA0718] But, the Court did not explain how this information would have assisted it in making any findings in light of the testimony that MedPro had no records showing that such a call had been made. In any event, the burden of proof was on Dr. Sutton, and she should have requested any voice recordings in discovery and introduced them at trial if she thought they could prove that she made the telephone call. Or she could have requested her own telephone records to substantiate the call. She did none of these things.

Ultimately, the district court relied on this speculative line of its own leading questions to Mr. Costy to conclude that the call center employees were unreliable, despite Mr. Costy's unrebutted testimony that he was not aware of any unreliable people at the call center and that he could not conceive of any situation where the

-47-

call center employees failed to do their one simple job. [JA0333:21-JA0334:13; JA0335:6-10]  Indeed, Mr. Costy testified that he had never had a situation involving an insured contending that he or she made a report about a claim or potential claim about which no record was available before; nor was he aware of this situation happening to anyone else at MedPro. [JA0285:18-JA0286:1]

The overwhelming record evidence, and all objective evidence, contradicted the district court's finding that Dr. Sutton called MedPro regarding the contents of the 2008 St. Francis Letter and that "Dr. Sutton's call was not properly processed by the MedPro call center." [JA0725] The district court's purported fact-finding, taken to its logical conclusion, means that even an insurance company with sound and helpful intake practices like MedPro will have the nearly impossible task of negating an insured's self-serving testimony that she reported a claim or potential claim within the policy period. The district court's judgment, therefore, was not supported by substantial evidence and should be reversed.

## IV.    THE DISTRICT COURT DENIED MEDPRO A FAIR TRIAL BY COMMANDEERING THE QUESTIONING OF PARTY WITNESSES TO CREATE A RECORD OSTENSIBLY SUPPORTING A FINDING THAT DR. SUTTON REPORTED A POTENTIAL CLAIM TO MEDPRO

MedPro is entitled to a new trial because the district court pre-judged the merits of what it saw as the defining factual issue: Whether Dr. Sutton called MedPro to report a potential claim, as reflected best in the court's rehabilitative

-48-

questions of Sutton and aggressive cross-examination of Mr. Costy. Indeed, the district court through its assertive questioning assumed the role of advocate for a position and not an impartial factfinder. This is grounds for reversal and a new trial.

### A.    Standard of Review

The Fourth Circuit can reverse a lower court because of a judge's questioning and frequent interruptions during trial when the judge's conduct revealed a bias or prejudgment in favor of a party that amounted to denial of a fair trial. *See Crandell v. United States*, 703 F.2d 74 (4th Cir. 1983) (reversing district court decision after bench trial in a medical malpractice action because the evidence indicated that the trial judge had prejudged the case). To be sure, a trial court judge operates with wide latitude as a "governor . . . to see that justice is done." *See Pollard v. Fennell*, 400 F.2d 421, 423-24 (4th Cir. 1968). "The judge, for example, is entitled to propound questions pertinent to a factual issue which requires clarification. He may intercede because of apparent inadequacy of examination or cross-examination by counsel, or to draw more information from relevant witnesses or experts who are inarticulate or less than candid." *Crandell*, 703 F.2d at 77-78. "This privilege or duty, however, is subject to reasonable limitations." *Id.* at 78. As the Fourth Circuit explained in *Crandell*:

> A trial judge must assiduously perform his function as governor of the trial dispassionately, fairly, and impartially. He must not predetermine

-49-

a case, and we must condemn any conduct before or during the course of a trial which indicates predisposition. It is important that a litigant not only actually receive justice, but that he believe he has received justice.

*Id.* at 78 (internal citations omitted).

### B. The District Court's Extensive Examination Of Mr. Costy and Rehabilitative Questioning of Dr. Sutton Demonstrate Bias And Pre-Judgment That Dr. Sutton Reported A Potential Claim To MedPro Despite Dr. Sutton's Lack Of Belief That The 2008 St. Francis Letter Represented A Potential Claim

The district court generally treated Mr. Costy, MedPro's witness, as a hostile witness subject to lengthy cross-examination via leading questions. Indeed, the judge's grilling of Mr. Costy consumed twelve pages of trial transcript, and the judge also interjected during other parts of Mr. Costy's examination by MedPro's counsel. On the other hand, the judge asked far fewer questions of Dr. Sutton (in three transcript pages) and treated her as a friendly witness who was not subject to the same amount or type of leading questions.

The district court asked Mr. Costy a series of questions regarding various employees at the call center, including the following exchange:

> **The Court**:  And how many, in May of 2008, how many people would be answering the phone at the call center?
>
> **The Witness**:  I would not know.
>
> **The Court**:  You don't know?
>
> **The Witness**:  No sir, I do not.

-50-

**The Court**:  How many of them would be trainees?

**The Witness**:  I would not know.

**The Court**:  And how long had those people in May 2008 been in place, if you know?

**The Witness**:  I do not know.

**The Court**:  How about Amanda Moon, do you know Amanda Moon?

**The Witness**:  Yes. I – Amanda was around for awhile, I would say a couple of years, and she may have gone over to just underwriting. She may --  I don't know what happened to her, but she was someone that was very reliable.

**The Court**:  But people who are very reliable can get promoted?

**The Witness**:  Yeah.

**The Court**:  How about the ones who aren't particularly reliable, what happens to them?

**The Witness**:  Pardon?

**The Court**:  The ones who are really reliable get promoted. What happens to the people who aren't reliable?

**The Witness**:  I don't know what happens to anybody.

**The Court**:  They maybe stay in the job?

**The Witness**:  I don't know. I just don't know. ***I don't know of anybody who is deemed unreliable.***

[JA0333:11-JA0334:13 (emphasis added)][10]

---

[10] This line of questioning regarding the competency of the call center employees echoed an earlier interjection by the judge during the examination of Mr. Costy, where the judge stepped in to establish that (i) Mr. Costy had not physically seen the call center; (ii) that Mr. Costy did not know the "pay range" for call center employees; (iii) that the call center employees are "clerical people, local people from Ft. Wayne" and (iv) that Mr. Costy had been talking to one call center employee for 9-12 months. [JA0296:22-JA0297:23]

Next, the court informed Mr. Costy that there were three explanations for what happened with respect to Dr. Sutton's alleged telephone call: (i) Dr. Sutton perjured herself at trial and did not actually ever call MedPro; (ii) she is mistaken because "she thinks she did [call] but she didn't" (the judge only included this second scenario at the insistence of Mr. Costy); or (iii) "she made the call and somehow the system didn't work." [JA0334:14-JA0335:10]

> **The Court:** Now, there are several potential explanations, Mr. Costy, of that. One of them is that Sutton came in this court and perjured herself, right? That's one explanation, correct?
>
> **The Witness:** Well, yeah, but –
>
> **The Court:** Okay. You don't believe that, do you?
>
> **The Witness:** Mistaken, perhaps.
>
> **The Court:** Okay. She might be mistaken, that's another thing. She thinks she did and she didn't. Another potential explanation is she made the call and somehow the system didn't work. That's another potential explanation, isn't it, Mr. Costy?
>
> **The Witness:** I'm sure it could be. ***I can't concede how, but*** – [at which point the witness was not allowed to finish his answer when he was interrupted by the district court judge.]

[JA0334:22-JA0335:10 (emphasis added)]

The judge then questioned Mr. Costy regarding MedPro's claims setup sheet. The judge asked a series of leading questions to establish that, had the letter been reported to MedPro by Sutton, then Mr. Costy would have been alerted to a potential claim involving Nathan Moore and would not be contesting coverage.

-52-

[JA0335:11-JA0339:17][11]  The judge concluded his questioning by circling back to

the possible explanations regarding who is telling the truth and signaled a view that

he thought the call center made the mistake:

> **The Court**:  So your view is – you were hesitant when I
> raised the question about Sutton perjuring herself –
> so your view would be that perhaps she is mistaken or
> perhaps one of the call center people was mistaken.
> Those are two possible explanations, am I right?
>
> **The Witness**:  Um, yes. But I would like to add that I
> am hesitant with Sutton only because I know her, and I
> – when I met her, I find her to be nice, engaging
> person. I think people make mistakes sometimes.
>
> **The Court**:  The call center person can make mistakes?
>
> **The Witness**:  Sometimes we get confused.
>
> **The Court**:  That can apply both to Sutton and to the
> call center personnel?
>
> **The Witness**:  Yeah, it can. It can.
>
> **The Court**:  I don't have any further questions.

[JA0341:12-JA0342:4]

In contrast to the cross-examination of Mr. Costy, the judge asked Dr. Sutton

far fewer questions and they were not leading questions like one would direct to a

hostile or uncooperative witness (which Mr. Costy clearly was not). [JA0256-

JA0259] First, the judge got Dr. Sutton to confirm that, had MedPro asked her to

supply the medical records when she said she called in 2008, she would have done

---

[11] Highlighting the unusual nature of the judge's questioning is an objection lodged by MedPro's counsel, which concludes by noting that "I don't think I've ever in my life objected to a judge's question." [JA0338:8-10]

so. [JA0256:3-24; JA0257:25-JA0258:2] Next, the court secured Dr. Sutton's

agreement that it would have been "obvious to anybody looking at the medical

records that theoretically would have been supplied to MedPro" that both a mother

and child were involved. [JA0257:15-19; JA0258:3-8] Similarly, the court led Dr.

Sutton to agree that "someone looking at whether there might be a potential claim

could discern that that claim might extend to the newborn child in light of the

child's compromised state at birth[.]"  [JA0257:20-24]

Finally, the court noted that counsel for MedPro and FPIC had inquired

about Sutton's deposition testimony. [JA0258:9-13] The court then read into the

record portions of Sutton's deposition testimony and concluded by clarifying what

Dr. Sutton was claiming at trial:

> **The Court**: So you stated there that you had told them
> what was in the content of that letter?
>
> **The Witness**: Yes.
>
> **The Court**: That was your testimony? *If you called
> them about a letter that was sitting in front of you,
> what would you have told them other than the content
> of the letter if you didn't remember anything else?*
>
> **The Witness**: I think I told them the content of the
> letter.
>
> **The Court**: I don't have any further questions.

[JA0259:4-13 (emphasis added)] In other words, the district court, on its own

initiative, rehabilitated and led Dr. Sutton's trial testimony with her deposition on a

point that was critical to the outcome of this case given the district court's

-54-

(erroneous) view of the Policy and the law as requiring only "substantial compliance" with the Policy's reporting requirement (which advocacy was contrary to Dr. Sutton's position that she never concluded a potential claim existed).

The situation here thus was analogous to the conduct in *Crandell*, where this Court reversed the district court after a bench trial and noted that "[a]n impartial observer could well conclude from the record in the case *sub judice* that the trial judge predetermined the outcome before the [plaintiffs] fully presented their case." *Id.* at 78. In this connection, the Court noted that the record revealed numerous judicial interjections indicating hostility toward the plaintiffs and their experts, "over-solicitous" acceptance of the testimony of defendant's expert, and the preclusion of plaintiffs from developing important evidence during trial. *Id.* The Court also determined that the judge had prevented effective cross-examination of the most important defense witness, which the Court found to be "particularly glaring since the defendant's counsel never objected to the form or appropriateness of the questions – ***the court simply assumed the role of an advocate***." *Id.* at 76-77 (emphasis added). Moreover, the Court found that some of the judge's remarks could only lead an impartial observer to conclude that the ultimate decision was influenced by concerns irrelevant to the issues, such as the price of malpractice

insurance and that "taxpayers" may ultimately bear the burden of paying any damages. *Id.* at 78.

Here, just as in *Crandell*, the district court here assumed the role of advocate. Circumstances that typically warrant greater judicial intervention in court proceedings, such as inadequate counsel or reluctant witnesses, clearly were not present. *Cf. Jackson v. United States*, 329 F.2d 893, 893 (D.C. Cir. 1964) ("Sometimes a trial judge intercedes because of seeming inadequacy of examination or cross-examination of witnesses by counsel; sometimes to draw more information from reluctant witnesses or experts who are either inarticulate, less than candid or not adequately interrogated. This is permissible, of course."). Indeed, the judge did much more than merely clarify a piece of testimony or coax a reluctant witness into providing more in-depth testimony; rather, the judge took on the role of counsel and advocate by eliciting testimony based on his own theories of the case.

Furthermore, as in *Crandell*, the court's scrutiny of the witnesses was one sided. Rather than ask equally challenging questions, the record shows that the judge treated Dr. Sutton as a friendly witness and Mr. Costy as a hostile witness. Likewise, the record demonstrates how the judge was especially solicitous of Dr. Sutton's testimony that she advised MedPro of the contents of the 2008 St. Francis Letter.

-56-

Finally, the judge's ultimate decision appears to be influenced by concerns questioning Mr. Costy that arguably are not relevant to the issues, such as the promotion schedule, salary scale and employee retention records for MedPro's call center employees, which Dr. Sutton herself never raised and which only became an issue because the district court made them an issue. In any event, whether the call center employee who would have received Sutton's notice was "clerical" or whether that employee was likely to be promoted within 12 months of employment had no bearing on whether Dr. Sutton actually reported any potential claim to MedPro.

Critically, from MedPro's perspective, the district court's questions, particularly to Mr. Costy, became the ostensible factual foundation for the court's factual finding that MedPro's call center could not be relied upon to perform the one simple task assigned to it of entering Dr. Sutton's contact information into a computer. In MedPro's view, the district court had a preconceived notion of the facts and law regarding Dr. Sutton's alleged call, and further subverted Dr. Sutton's belief that she did not reasonably believe a potential claim would be made, inuring to FPIC's benefit, and the detriment of Dr. Sutton wishes and MedPro's contract with Dr. Sutton, based upon a view that South Carolina law should follow the minority of jurisdictions against strict compliance with reporting requirements under a claims made and reported policy.

-57-

For these reasons, MedPro is entitled to a new trial.

## CONCLUSION

For the foregoing reasons, this Court should reverse the district court's order and remand for a judgment in MedPro's favor and dismissing Dr. Sutton's third party complaint. At the very least, the district court's order should be reversed and the case remanded for trial.

## REQUEST FOR ORAL ARGUMENT

Because of the novel issues presented on this appeal, MedPro respectfully requests oral argument.

Respectfully Submitted by,

**TROUTMAN SANDERS LLP**

By: */s/ Gabriela Richeimer*
     JOHN R. GERSTEIN
     GABRIELA RICHEIMER
     401 9th Street, N.W.
     Suite 1000
     Washington, D.C. 20004
     (202) 274-2950

**GALLIVAN, WHITE & BOYD, P.A.**

By: */s/ John T. Lay, Jr.*

    John T. Lay, Jr.
    Laura Jordan
    Janice Holmes
    1201 Main Street, Suite 1200
    Columbia, South Carolina 29201
    803-779-1833

Attorneys for Appellant and Third Party
Defendant The Medical Protective Company

September 17, 2013

## CERTIFICATE OF COMPLIANCE WITH RULE 28.1(E) OR 32(A)

Type-Volume Limitation, Typeface Requirements, and Type Style Requirements

1. Type-Volume Limitation: Appellant's Opening Brief, Appellee's Response Brief, and Appellant's Response/Reply Brief may not exceed 14,000 words or 1,300 lines. Appellee's Opening/Response Brief may not exceed 16,500 words or 1,500 lines. Any Reply or Amicus Brief may not exceed 7,000 words or 650 lines. Counsel may rely on the word or line count of the word processing program used to prepare the document. The word-processing program must be set to include footnotes in the count. Line count is used only with monospaced type.

   This brief complies with the type-volume limitation of Fed. R. App. P. 28.1(e)(2) or 32(a)(7)(B) because:

   ☒ this brief contains 13,938 [*state number of*] words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), or

   ☐ this brief uses a monospaced typeface and contains [*state number of*] lines of text, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2. Typeface and Type Style Requirements: A proportionally spaced typeface (such as Times New Roman) must include serifs and must be 14-point or larger. A monospaced typeface (such as Courier New) must be 12-point or larger (at least 101/4 characters per inch).

   This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

   ☒ this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2007 [*identify word processing program*] in 14-point Times New Roman [*identify font size and type style*]; or

   ☐ this brief has been prepared in a monospaced typeface using _____ [*identify word processing program*] in _____ [*identify font size and type style*].

*(s) Gabriela Richeimer*
Attorney for The Medical Protective Company
Dated: 9/18/2013

## CERTIFICATE OF SERVICE

I certify that on September 18, 2013, the foregoing CORRECTED BRIEF

OF APPELLANT THE MEDICAL PROTECTIVE COMPANY was filed on the

CM/ECF system, which served the document on all parties or their counsel.

*s/ Gabriela Richeimer*
Gabriela Richeimer

*Counsel for Third-Party Defendant-Appellant The Medical Protective Company*